OPINION
{¶ 1} This case is before us on the expedited appeal of Jessica Bowers (nka Koch) from a trial court decision terminating a shared parenting plan and designating Ronald Bowers, Jr., as residential parent and legal custodian of the parties' minor child, Ronald Bowers, III (Ronnie). In support of her appeal, Koch raises the following assignments of error:
 {¶ 2} "I. THE TRIAL COURT DECISION GRANTING CUSTODY TO APPELLEE FATHER IS AGAINST THE MANIFEST WEIGHT OF EVIDENCE PRESENTED AT TRIAL AND DID NOT ACCURATELY REFLECT THE SUBSTANTIAL TESTIMONY GIVEN CONCERNING THE CHILD'S BEST INTERESTS WHEN CONSIDERED UNDER O.R.C. 3109.04(F)(1).
 {¶ 3} "II. THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S REQUEST FOR PSYCHOLOGICAL EXAMINATION OF THE PARTIES AND CHILD."
 {¶ 4} After reviewing the record, we find that the assignments of error are without merit. Accordingly, the judgment of the trial court will be affirmed.
 I {¶ 5} In this case, a magistrate heard testimony and issued a decision recommending that the shared parenting plan be terminated. After discussing the evidence, the magistrate found that the parties were unable to cooperate and that terminating the shared parenting plan would be in Ronnie's best interests. The magistrate then found that Ronnie's best interests would be served by placing him in his father's custody. Koch was given visitation with Ronnie in accordance with Option II of the court's standard visitation schedule. She was also ordered to pay $112.02 in child support per month. After Koch filed objections to the magistrate's decision, the trial court adopted the decision and added its own discussion of the case.
 {¶ 6} Koch concedes on appeal that terminating the shared parenting plan was justified under the circumstances. However, she contends that the trial court lost its way and created a manifest miscarriage of justice by focusing on her ex-husband's lost parenting time and by failing to consider that she acted in good faith by bringing sexual abuse allegations to the attention of authorities.
 {¶ 7} When we consider if judgments are sustained by the weight of the evidence, we apply the following standard, taken from the criminal context, which is that:
 {¶ 8} "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v.Thompkins (1997), 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541, quoting from State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717.
 {¶ 9} In State v. Lawson (Aug. 2, 1997), Montgomery App. No. 16288, 1997 WL 476684, we stressed that manifest weight power must be exercised cautiously because the factfinder, whether it be a jury or trial judge, has the chance to see and hear witnesses. As a result, we give "substantial deference" to a factfinder's credibility determinations. Id. at *4.
 {¶ 10} The magistrate in this case is the individual who heard the testimony and had the ability to assess witness credibility. Her decision clearly indicates that she did not find the testimony of Koch and Koch's fact witnesses credible. In adopting the magistrate's decision, the trial court also expressed reservations about Koch's credibility. Therefore, while Koch feels that she is the more appropriate parent to receive custody, the trial court and magistrate did not have to agree. They also did not have to ignore inconsistencies in testimony.
 {¶ 11} The minor child, Ronnie, was born on June 28, 2000. When Ronnie was about two and a half years old, his parents divorced and entered into a shared parenting agreement. Both parents were given equal parenting rights, and Bowers was allotted parenting time every other Thursday from 5:30 p.m. to Sunday at 8:00 p.m., and every other Tuesday from 5:30 p.m. to Thursday morning at 7:15 a.m. The rest of the time, Ronnie was with his mother. Thus, while Koch's residence was more primary, Ronnie spent substantial time with his father.
 {¶ 12} The shared parenting plan was filed on March 24, 2003. In the plan, both parents agreed that they would make:
 {¶ 13} "concerted efforts to safeguard the child's mental, emotional, physical and psychological well-being and the major means to achieve these aims is to provide the maximum possible continuity and interaction between the child and each parent. To alleviate the potentially harmful effects of the termination of their relationship on the child, each party shall take all reasonable steps to show the child the depth and continuing nature of their parental commitment. Both parents believe it is in the best interest of the child to make this positive statement concerning the mutual love and commitment they share for their child. Each parent shall take all measures necessary to foster a feeling of affection between the child and the other parent with neither doing anything which may estrange the child from the other parent or impair the child's high regard for the other parent."
 {¶ 14} The parties also agreed in the plan that they would make joint decisions for Ronnie's well-being in areas like "health and safety, education, spiritual development, and recreation and social needs, * * * except in cases of emergency." In the event of an emergency, the party with physical custody of the child had to immediately notify the other parent if emergency medical treatment was needed. The agreement further stated that "In the event the parties are unable to agree upon a decision on these matters, such matters shall be submitted to the Court for resolution, for which the Court specifically retains jurisdiction."
 {¶ 15} There were apparently no significant problems with visitation for several months. In June, 2003, Jessica Bowers married Jacob Koch. Mr. Bowers indicated that visitation problems began in July, 2003. At that time, Ms. Koch asked Bowers to take Ronnie for a week because she had things to do. When Bowers agreed, Koch told him that he would have to take Ronnie that week as part of his two-week extended summer visitation. However, Bowers was ultimately denied the week's visitation.
 {¶ 16} At some point, Koch notified Bowers that she intended to take her two-week extended summer visitation period from August 18 through August 31, 2003. However, when Bowers gave Koch a letter the first weekend in August, stating that he wanted to exercise his two-week summer visitation period from September 4 though September 18, 2003, Koch said that Bowers had not given her sufficient notice. At that time, Koch told Bowers that he was not getting the child, and that if he did not return him, Koch would call the police and have Bowers arrested.
 {¶ 17} On August 28, 2003, Koch notified Greene County Children Services about alleged sexual actions of her son, Ronnie. For example, Ronnie allegedly fondled himself in the bathtub, tried to grab his brothers' private parts when they walked by, and fondled the family dog. Koch also reported that Ronnie was having nightmares.
 {¶ 18} When Bowers called Koch on August 30, 2003, to ask about picking up Ronnie for visitation, he was told the child was sick, and to call back. After trying to call and receiving no answer, Koch also missed the visit scheduled for September 2-4, 2003. He obviously did not receive his two-week extended visitation, either. Subsequently, on September 8, 2003, Mercer County detectives came to Bowers' home and explained what was going on. At the time, Koch lived in Mercer County and Bowers lived in Greene County.
 {¶ 19} Detective Pat Elking of the Mercer County Sheriff's Office investigated the abuse allegations and also testified at the custody hearing in this case. Elking stated that he was contacted by Kandy Lyons of the Greene County Children Services Bureau (CSB). Lyons said CSB had received a referral of sexual abuse involving Bowers and his son, Ronnie, in which Bowers was alleged to have sexually touched the child. Elking testified that he had investigated hundreds of sexual abuse allegations in his 24 years as a police officer. Elking watched a video tape interview of Ronnie that was done by a woman with the victim advocate's office. He described it as a very competently done interview in which Ronnie denied any sexual abuse allegations. Ronnie did not seem interested in the subject of sexual abuse. Ronnie said he liked his dad and did not seem at all as if he was trying to hide anything.
 {¶ 20} After viewing the videotape, Mercer and another detective talked to Bowers, who was quite frank and forthright in his denials. Bowers asked what he could do to clear himself and the police offered a voice stress analysis test, which was subsequently administered by an officer from the Celina Police Department. During the test, Bowers denied the abuse allegations and the charts showed he was non-deceptive.
 {¶ 21} Elking also reviewed a videotape that Jessica Koch or her family had made, in which Koch talked to Ronnie about the abuse allegations. In testimony during the custody case, Jessica Koch claimed that Kandy Lyons of the CSB had asked her to make this videotape. However, the Guardian Ad Litem (Stephen King) directly contradicted this testimony. According to King, Lyons had specifically instructed Jessica Koch not to discuss the abuse allegations with Ronnie. King also said that Lyons felt Koch's videotape had been manufactured. In addition, King's guardian ad litem report noted that Lyon's overall impression was that Ronnie was exhibiting "implanted memory."
 {¶ 22} Elking placed little weight on the videotape that Koch made, because it violated various safeguards the police follow when interviewing children. The interview also contained leading questions. Elking considered the tape to have no evidentiary value.
 {¶ 23} Another witness who testified at the custody hearing was Jessica Koch's half-sister, Michelle Miller. Miller testified that when she was at Koch's house, Koch told her that Bowers was being accused of sticking his finger up little Ronnie's butt. Koch then showed her a videotape of Ronnie where he eventually said, "My mean daddy did it." Koch told Miller that it took her seven or eight times to get Ronnie to say that. Although Miller did not particularly like Bowers, she did not think he was capable of doing anything like that. She also connected the false abuse allegations to remarks she had heard Jessica and others previously make about getting Bowers out of Ronnie's life. As a result, Miller called Bowers and told him what Koch had said. She also spoke to Elking.
 {¶ 24} Based on his investigation, Elking concluded there was little foundation to substantiate the allegations and no chance of a criminal prosecution. Elking then sent a copy of the case to Lyons on September 16, 2003, and talked to the CSB prosecutor, who agreed that there was no basis for a prosecution. Elking indicated that he took Miller's information into consideration, but said that his conclusion would not have been any different without the information. There was simply no basis for a criminal prosecution.
 {¶ 25} On September 26, 2003, Lyons called Bowers at work and told him that his visitation was being reinstated. In the meantime, Bowers had missed visitation on September 2-4, 16-18, and on September 25. Bowers then tried to call Koch several times, but got no answer, so he left messages. On September 29, 2003, Bowers called Lyons and told her that he had not gotten any answer. Lyons said the matter was out of her hands and that he should take it up with an attorney.
 {¶ 26} Bowers' next scheduled visit would have been September 30, 2003. However, on that date, Koch filed a petition with the Greene County Common Pleas Court, asking for a civil protection order (CPO). Greene County issued an ex parte order, and scheduled the matter for a hearing on October 14, 2003. In the meantime, Bowers did not receive the visitation that should have taken place on September 30, nor did he receive the visitation he should have had during October 9 though 12, 2003.
 {¶ 27} Subsequently, on October 14, 2003, the parties appeared in Greene County, and the hearing on the CPO was continued. In the interim, Bowers was given the right to visit with his son on Sundays from 1 p.m. to 4 p.m., with the stipulation that his girlfriend, Amanda Hemmelgarn, be present during visitation. The parties were to meet at the food court of the Miami Valley County Mall in Piqua for the exchange. Following the entry of this order, Bowers received visitation at the arranged time on October 19, and on November 2, 9, and 16, 2003.
 {¶ 28} On November 19, 2003, Bowers filed a motion in the Darke County divorce action, asking for termination of the shared parenting decree. According to Bowers, Koch then did not show up with Ronnie for the visitation scheduled for November 23, 2003. Koch disputed this, claiming that Bowers was the one who did not show up. In any event, Bowers did receive visitation on December 7. However, no one showed up on December 14, or 21, 2003.
 {¶ 29} On December 23, 2003, an entry was filed in the Greene County CPO case, indicating that all custody and parenting time issues would be heard in Darke County. Subsequently, on March 18, 2004, the magistrate in Greene County filed a decision dismissing Koch's petition for a CPO. Among other things, the magistrate found that Koch had primarily filed the CPO petition to prevent Bowers "from exercising visitation with their child after the CSB investigation was closed."
 {¶ 30} On the same day that Greene County declined to address custody and parenting time, i.e., December 23, 2003, Koch filed a motion in the present case, asking for an emergency ex parte temporary custody designating her the custodial and residential parent. Koch also asked the trial court to limit Bowers to supervised visitation from 1:00 to 4:00 p.m. on Sundays either at the Miami Valley Mall or at a location called "Erma's Visiting House" in Dayton, Ohio. In an affidavit, Koch again alleged that sexual abuse was occurring.
 {¶ 31} The trial court initially filed an ex parte order on December 23, 2003, granting supervised visitation at the limited time of 1:00 p.m. to 4:00 p.m. on Sundays. However, on the following day, the trial court filed an entry vacating the temporary order. In the entry, the court noted that Greene County had vacated its visitation orders at a hearing held on December 23, 2003. Accordingly, the trial court ordered that the parties should resume parenting time pursuant to their shared parenting agreement, with the proviso that another responsible adult should be present during Bowers' parenting time. Thereafter, from January 1, 2004, though the time of the custody hearing on June 28, 2004, visitation proceeded as scheduled for the most part.
 {¶ 32} Stephen King was appointed as Guardian Ad Litem in early February, 2004. King met with Bowers in his office and also did a home study on February 26, 2004. Because Bowers lived some distance away, King combined the initial interview with the home visit. After speaking with the parties and talking to a number of witnesses and counselors, King recommended that shared parenting be terminated and that Ronald receive legal and residential custody. King also concluded that Koch had continuously or willfully denied visitation.
 {¶ 33} On March 24, 2004, Bowers took Ronald to Darke County Mental Health Clinic. Ronald told the therapist, JoAnn Beekhuizen, that he had been accused of molesting his son and had been cleared of those charges. Bowers indicated that he felt Ronnie was being molested in the mother's home and wanted to know what was going on. After doing an assessment of Ronnie, Beekhuizen did not find any developmental delays. She also conducted play therapy and was concerned because of violence and aggression themes that presented themselves. There was nothing in the play that was sexualized or indicated any sexual abuse. Instead, the play raised concerns about violence the child had been exposed to in the home. Ronnie reported to the therapist that he watched violent movies at his mother's house.
 {¶ 34} Beekhuizen also had play therapy about discipline after Bowers said he had made a report to Children Services about a bruise Ronnie had received after being spanked with a belt. Ronnie indicated that his "Daddy Jake" spanked him and took off his black belt for spankings. There were no indications when Ronnie acted out that he was fearful of his father. He did often refer to Bowers as his "mean daddy" and to Koch's husband as "Daddy Jake." When Beekhuizen asked Ronnie if Bowers was ever mean to him, he said no. Another time he referred to Bowers as "mean daddy" and said, "Daddy is mean because my mommy said he cut her leg off." At the same play session, after he made that statement, he took the daddy doll figure and buried it in sand repeatedly. When Beekhuizen asked him why he did that, he said, "So he doesn't get hurt."
 {¶ 35} Beekhuizen concluded that Ronnie had a lot of anxiety. One thing she had him do shortly before the hearing was to draw faces that are called feeling faces. She had him draw how he felt when he was with Daddy, when he was with Daddy Jake, and when he was with Mommy. According to Beekhuizen, "And especially when he got to mommy, he switched crayons to black and there is no face. It's just scribbles. It's just marked out and that, again, is indicative of a great deal of anxiety."
 {¶ 36} There was evidence that domestic violence was occurring in Koch's home, although Koch and her husband, Jacob, denied this. Ms. Koch's father (Richard Glover) testified that he was aware that Jacob had hit or pushed Koch. In fact, Glover said that he had gotten in Jacob's face about it. In contrast, Jacob testified that he and Glover had a great relationship and that Glover had never confronted him about physically picking on Ms. Koch. Jacob also testified that he had never spanked Ronnie with a belt and had never pushed Koch.
 {¶ 37} Likewise, Koch denied having any physical altercations with Jacob. In contrast, however, a medical record from Koch's doctor on January 10, 2004, indicates that Koch had reported getting into an argument with her boyfriend. The report indicated that the boyfriend ended up pushing her, and she fell into the bathtub. At the time this incident occurred, Koch was several months pregnant with Jacob's child. When Koch was confronted with the medical record, she claimed that the bathroom floor was wet from being mopped, causing her to slip and fall into the tub.
 {¶ 38} Another incident occurred when Koch was pregnant. On that occasion, Koch and Jacob had an argument that was serious enough to have the police called by a neighbor. Koch locked Jacob out of the house and he pounded on the door so loudly that a neighbor called the police. Koch dismissed this as simply the result of the fact that the neighbor did not like her. Unfortunately, Ronnie was home when this incident occurred. The record also reveals that Koch filed domestic violence allegations against her own father when she was a juvenile.
 {¶ 39} In September, 2003, Koch took Ronnie to a therapist, who diagnosed him as having anxiety, not otherwise specified, meaning that there were many possible causes of anxiety and a lack of any specific outcome in counseling. The therapist, who was a counselor trainee, did not testify at length at the custody hearing. Her supervisor, who was licensed, testified about the trainee's notes, which included a reference to Ronnie talking about his daddy touching him. The first time the supervisor recalled hearing the phrase "mean daddy" was while Ronnie was talking about the fact that his father had touched him and identified him as "mean." The supervisor stated that children Ronnie's age do not typically talk about things like that unless something had happened. However, she also indicated that this does not necessarily mean that abuse has occurred.
 {¶ 40} There was also testimony from Koch indicating that her relationship with her sister, Michelle, was strained because Michelle thought Koch had been involved in reporting Michelle for welfare fraud. Koch denied telling Michelle that it had taken numerous tries to get the videotape right.
 {¶ 41} The above evidence indicates that there were a few factual issues that the magistrate and trial court resolved in Bowers' favor. However, this does not mean that there was a miscarriage of justice. To the contrary, we find that the trial court's decision was well-supported by the evidence.
 {¶ 42} Under R.C. 3109.04(E)(a), a trial court may not modify a prior decree allocating parental rights unless it finds a change of circumstances and that "the modification is necessary to serve the best interests of the child." In deciding the best interest of the child, the court considers all relevant factors, including, but not limited to:
 {¶ 43} "(a) The wishes of the child's parents regarding the child's care;
 {¶ 44} "(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;
 {¶ 45} "(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;
 {¶ 46} "(d) The child's adjustment to the child's home, school, and community;
 {¶ 47} "(e) The mental and physical health of all persons involved in the situation;
 {¶ 48} "(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;
 {¶ 49} "(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;
 {¶ 50} "(h) Whether either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;
 {¶ 51} "(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;
 {¶ 52} "(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state. R.C. 3109.04(F)(1)."
 {¶ 53} Not all of the above factors apply to the present case. For example, the court did not interview the minor child in chambers and neither parent was planning to move out of state. R.C. 3109.04(F)(1)(b) and (j). The magistrate and trial judge did consider the remaining factors, and did place some weight on the "parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights" and on "[w]hether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court." R.C. 3109.04(F)(1)(f) and (i). This was not inappropriate.
 {¶ 54} In this regard, the magistrate noted that:
 {¶ 55} "Defendant [Koch] has willfully denied visitation to the Plaintiff [Bowers] on numerous occasions and appears to have gone "forum shopping" in an attempt to end visitation, going from one agency or court to another when visitation was reinstated. The Guardian Ad Litem found that the Plaintiff would be more likely to facilitate visitation."
 {¶ 56} In adopting the magistrate's decision, the trial court agreed, and further remarked that "the credibility of the Defendant is called into question in view of her attempts to manipulate visitation and custody through the attempt in Greene County to obtain a civil protection order and the allegations of child abuse in Mercer County that were found to be without merit."
 {¶ 57} These findings are well-substantiated by the record. We should note that the unsubstantiated allegations of sexual abuse are particularly troubling. In Beekman v. Beekman (1994), 96 Ohio App.3d 783,645 N.E.2d 1332, the Fourth District Court of Appeals stressed that:
 {¶ 58} "[a]lthough a court grants one parent custody and the other visitation, the children need to know that they are loved by both parents regardless of the antagonism the parents might feel for each other. It is the duty of each parent to foster and encourage the child's love and respect for the other parent, and the failure from that duty is as harmful to the child as is the failure to provide food, clothing, or shelter. Perhaps it is more harmful because no matter how well fed or well clothed, a child cannot be happy if he or she feels unloved by one parent.
 {¶ 59} "When a court makes a custodial decision, it makes a presumption that the circumstances are such that the residential parent will promote both maternal and paternal affection. The residential parent implicitly agrees to foster such affection, not out of any good feeling toward the nonresidential parent, but out of the need of the child for both parent's love. * * * Unsubstantiated allegations of abuse are the worst kind of poisoning of the relationship." Id. at 789.
 {¶ 60} In the present case, Koch did not just impliedly agree to foster Ronnie's affection for his father — she expressly agreed in the shared parenting plan to promote this affection. Koch also agreed to avoid "doing anything which may estrange the child from the other parent or impair the child's high regard for the other parent." However, rather than promoting the relationship between her son and his father, Koch appears to have done all she could to destroy it. On appeal, Koch contends that the trial court failed to consider that she had a reasonable basis for her concerns. However, the trial court clearly did not believe Koch. This was the court's prerogative.
 {¶ 61} Koch also claims that the trial court improperly ignored her testimony about visitation that Bowers had missed. In the first place, most of the alleged missed visitation that Koch testified about took place in January and February, 2003, before the shared parenting plan was filed. A few other instances of missed visitation allegedly took place in the summer of 2003. However, they pale in significance when one considers that Bowers was deprived of any meaningful visitation and companionship with his young son between August, 2003, and January, 2004. Furthermore, as the trial court stressed, as soon as Bowers succeeded in getting his visitation reinstated in one forum, Koch went to another court and obtained ex parte restrictions on visitation that took substantial time to resolve. In the meantime, Bowers went for months without being able to see his son.
 {¶ 62} Koch additionally argues that the trial court should have considered Bowers' lack of daily involvement in the life of his child. Notably, the trial court found that Bowers had significantly participated in raising his son and that the record demonstrated appropriate parenting practices. We agree with this finding. We would also point out that a parent cannot be involved daily with his child when he is precluded from visiting the child for long periods of time.
 {¶ 63} The final point Koch raises is that Bowers had the child around and in the presence of an individual who had attended sex offenders training. Bowers was questioned during the custody hearing about a friend who might be a registered sex offender. Bowers indicated that he had known the man for about seven years and believed he had been in a sex offenders' class. According to Bowers, the man had custody of his own children and had seen Ronnie only once in the past year, or twice, at a maximum.
 {¶ 64} The fact that an individual may be a sex offender does not mean he or she is a pedophile and is a danger to children. There was no evidence that the individual in question was a pedophile. There was also no evidence that Bowers ever placed Ronnie in a position of danger in any way. If Koch had evidence that the child had been placed in danger or was exposed to a pedophile, she could have presented such facts to the court. However, she did not present any facts, but simply made unsubstantiated allegations, as she had before with the sexual abuse complaints against Bowers. Notably, the Children Services Board, police, and a therapist found no evidence that Ronnie had been sexually abused. And, while Ronnie did make a remark to one therapist about abuse, the CSB representative felt Ronnie exhibited "implanted memory." In the absence of any actual proof that the child was in danger, the trial court did not err in finding that Bowers should be the residential parent and legal custodian.
 {¶ 65} In this regard, we must stress that the record fails to contain any indication that Ronnie was exposed to dangers while in his father's home or in his father's custody. However, there is evidence that Ronnie's anxiety was caused by violence to which he had been exposed in his mother's home. Accordingly, the first assignment is without merit and is overruled.
 II {¶ 66} In the second assignment of error, Koch contends that the trial court should have granted her request for psychological testing. The request was made at the end of the custody hearing on June 28, 2004, after the matter had been pending for more than seven months. After reviewing the evidence and the magistrate's decision, the trial court specifically found that additional psychological evaluations were not necessary.
 {¶ 67} Regarding custody investigations, R.C. 3109.04(C) provides that:
 {¶ 68} "[p]rior to trial, the court may cause an investigation to be made as to the character, family relations, past conduct, earning ability, and financial worth of each parent and may order the parents and their minor children to submit to medical, psychological, and psychiatric examinations. The report of the investigation and examinations shall be made available to either parent or the parent's counsel of record not less than five days before trial, upon written request. The report shall be signed by the investigator, and the investigator shall be subject to cross-examination by either parent concerning the contents of the report. The court may tax as costs all or any part of the expenses for each investigation."
 {¶ 69} Under this statute, the trial court has discretion in deciding whether to order psychological evaluations. See, e.g., Harness v.Harness (2001), 143 Ohio App.3d 669, 675, 758 N.E.2d 793. Therefore, we review the court's decision for abuse of discretion, which "`connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable.'" Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219, 450 N.E. 2d 1140 (citations omitted).
 {¶ 70} Koch contends that if psychological evaluations had been done, the trial court may have altered its opinion of her and may have designated her the residential parent and legal custodian. We disagree. The trial court heard testimony from three counselors, a guardian ad litem, and numerous other witnesses. Consequently, the court had an ample basis for making a decision about Ronnie's best interests. This is particularly true since the real issue was a matter of credibility. As we noted, there were inconsistencies in Koch's testimony and the court simply did not believe what she had to say. There was also no showing of instability on Bowers' part. Under these circumstances, the trial court did not act arbitrarily, unreasonably or unconscionably when it refused to order psychological evaluations.
 {¶ 71} Accordingly, the second assignment of error is without merit and is overruled. Because both assignments of error have been overruled, the judgment of the trial court is affirmed.
Wolff, J., and Fain, J., concur.